UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v.-<br><br>YANI BENJAMIN ROSENTHAL HIDALGO,<br><br>                      Defendant. | S5 13 Cr. 413 (JGK) |

## THE GOVERNMENT'S SENTENCING MEMORANDUM

JOON H. KIM
Acting United States Attorney
Southern District of New York
*Attorney for the United States*
*of America*

Emil J. Bove III / Matthew J. Laroche
*Assistant United States Attorneys*
*   Of Counsel*

## TABLE OF CONTENTS

BACKGROUND ..................................................................................................................... 3

   I.   Country Conditions in Honduras and the *Cachiros* Drug-Trafficking Organization ......... 3

   II.  The Defendant's Assistance to the *Cachiros* and Other Honduran Drug Traffickers ........ 6

      A.   The Defendant Used Empacadora to Launder *Cachiros* Drug Proceeds........................ 6

      B.   The Defendant Accepted Substantial "Campaign Contributions" From Honduran Drug Traffickers During His 2012 Presidential Campaign.............................................................. 8

      C.   The Defendant Participated In Other Aspects of the *Cachiros*-Rosenthals Money-Laundering Scheme ....................................................................................................... 10

A GUIDELINES SENTENCE IS APPROPRIATE IN THIS CASE ......................................... 14

   I.   Applicable Law .............................................................................................................. 14

   II.  The Defendant Facilitated the Activities of Violent Drug-traffickers ............................. 16

      A.   The Nature and Circumstances of the Offense ............................................................. 16

      B.   The History and Characteristics of the Defendant........................................................ 19

      C.   The Need to Afford Adequate Deterrence .................................................................... 20

      D.   The Defendant's Sentencing Submission ..................................................................... 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

YANI BENJAMIN ROSENTHAL HIDALGO,

                              Defendant.

S5 13 Cr. 413 (JGK)

The Government respectfully submits this memorandum in advance of sentencing in this matter, currently scheduled for December 15, 2017, at 10:00 a.m., on the defendant's conviction of money laundering, in violation of Title 18, United States Code, Section 1957.  The defendant pled guilty to engaging in a sophisticated money-laundering operation with the leaders of the largest and most violent drug-trafficking organization in Honduras known as the "*Cachiros*." Through his conduct, which occurred over a period of at least five years, the defendant provided the *Cachiros* with sources of funding for their criminal enterprise, a means to launder their narcotics proceeds, and public legitimacy, thereby contributing to an environment that allowed the *Cachiros* to thrive in their country and to import tons of cocaine into ours.

During his plea allocution, the defendant explained that he authorized a company he controlled, Empacadora Continental, S.A. de C.V. ("Empacadora"), to purchase narcotics-derived cattle from Ganaderos Agricultores Del Norte S De RL De CV ("Ganaderos"), a front company created by the leaders of the *Cachiros*.  Empacadora, in turn, processed and exported the meat to the United States, among other places, in exchange for payments to Empacadora from U.S.-based companies that totaled $500,000.  Even in a vacuum, this conduct—facilitating financial transactions involving hundreds of thousands of dollars for violent drug-traffickers—is

extremely serious.  But focusing on these activities alone, as the defendant does in his sentencing submission, does not appropriately contextualize the defendant's background, character, and course of conduct in this case.

As described in detail below, prolific drug-trafficking has contributed to Honduras becoming one of the most violent places in the world.  Over the course of years-long relationships, the defendant and his co-conspirators, including his father, used their political power and business holdings to assist the *Cachiros* in laundering millions of dollars in drug-trafficking proceeds.  This assistance was not limited to simply purchasing narcotics-derived cattle through Empacadora; rather, the defendant and his co-conspirators helped the *Cachiros* launder drug-trafficking proceeds through, and obtain sham loans in the name of, three other Honduras-based businesses. These financial transactions in Honduras—most of which were facilitated by Banco Continental, S.A. ("Banco Continental"), a bank owned and controlled by the defendant's family—totaled over $15 million.  Indeed, the defendant admits in his sentencing submission that Empacadora alone paid approximately ***$6.8 million*** to Ganaderos.  (Def. Submission at 11).  The defendant also separately accepted hundreds of thousands of dollars in purported "campaign contributions" from one of the *Cachiros* and another major Honduran drug trafficker.

At bottom, the defendant took advantage of his vast political and social power to facilitate the activities of violent drug-traffickers in a country that has been ravaged by drug-related violence.  The defendant did so despite the fact that he was one of the most powerful individuals, and a member of one of the most powerful families, in Honduras, who did not need to accept any business from drug-traffickers in order to maintain his social position or vast wealth.  A significant

2

sentence is necessary to reflect the incredible seriousness of the crime, provide just punishment, provide the needed general and specific deterrence, and reflect the history and characteristics of the defendant.  For these reasons and those set forth below, the Government respectfully submits that a Guidelines sentence of between 51 to 63 months' imprisonment is appropriate in this case.

## BACKGROUND

**I.      Country Conditions in Honduras and the *Cachiros* Drug-Trafficking Organization**

Honduras is one of the principal transshipment points in the world for cocaine that is produced in South America and imported into the United States.[1]  Beginning in at least 2004, multiple drug-trafficking organizations operating in Honduras and elsewhere worked in concert with politicians, law enforcement officials, and military personnel to receive multi-hundred-kilogram loads of cocaine sent to Honduras from Venezuela and Colombia via air and maritime routes, and to transport the drugs westward in Honduras toward the border with Guatemala and eventually to the United States.  (PSR ¶ 11).[2]

---

[1] *E.g.*, United Nations Office on Drugs and Crime, *World Drug Report 2016* at 37-38 (2016), http://www.unodc.org/doc/wdr2016/WORLD_DRUG_REPORT_2016_web.pdf; *see also* Steven Dudley, *How Drug Trafficking Operates, Corrupts in Central America*, InSight Crime (July 6, 2016), http://www.insightcrime.org/news-analysis/how-drug-trafficking-operates-corrupts-in-central-america ("Central America has long been a bridge that connects the producer countries in South America to the consumer nations in the north, principally the United States.").

[2] "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office in connection with the defendant's sentencing; "Def. Submission" refers to the defendant's sentencing submission filed on December 1, 2017; and "Mar 6 Tr." refers to the transcript of the testimony of Devis Leonel Rivera Maradiaga from the *Fatico* hearing on March 6, 2017, in *United States* v. *Fabio Porfirio Lobo*, 15 Cr. 174 (LGS).

In an effort to curry favor that would lead to protection from law enforcement scrutiny and favorable extradition policies, drug traffickers made "campaign contributions" to Honduran politicians holding and/or running for office.  (PSR ¶ 11).  For further protection from official interference, and in order to facilitate the safe passage through Honduras of these massive loads of cocaine, drug traffickers also paid bribes to public officials for access to information about ongoing investigations, military and law-enforcement checkpoints, and planned narcotics interdictions.[3]   (*Id.*).   These extensive drug-trafficking networks contributed to Honduras becoming one of the most violent places in the world during the time of the defendant's offense.[4] (*Id.*).

One of the most powerful drug-trafficking organizations identified during the course of this investigation was the *Cachiros*.  (PSR ¶ 12).  The *Cachiros* was a prolific and violent criminal syndicate in Honduras responsible for receiving large loads of cocaine sent to Honduras

---

[3] *See, e.g.*, U.S. Dept. of State, *Honduras 2014 Human Rights Report* at 17 ("Government institutions were subject to corruption and political influence, and some officials engaged in corrupt practices with impunity."), *available at* http://www.state.gov/documents/organization/236910.pdf.

[4] *See* U.S. Dept. of State, *Honduras 2014 Human Rights Report* at 1 ("Pervasive societal violence persisted.  Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of murder, extortion, kidnapping, torture, human trafficking, and intimidation of journalists and human and worker rights defenders."); *see also* "SOUTHCOM chief: Central America drug war a dire threat to U.S. national security," *Military Times* (July 2014) ("By U.N. statistics, Honduras is the most violent nation on the planet with a rate of 90 murders per 100,000 citizens. . . . These figures become more shocking when compared to those of declared combat zones such as Afghanistan or the Democratic Republic of the Congo (28 in 2012).  Profits earned via the illicit drug trade have corrupted and destroyed public institutions . . . , and facilitated a culture of impunity – regardless of crime – that delegitimizes the state and erodes its sovereignty, not to mention what it does to human rights.").

from South America via air and maritime routes, and transporting the cocaine within Honduras on behalf of Mexican drug-traffickers who imported substantially all of the cocaine at issue into the United States.  (Mar. 6 Tr. 12:1-13:15).

Devis Leonel Rivera Maradiaga and Javier Eriberto Rivera Maradiaga were the leaders of the *Cachiros*.  (Mar. 6 Tr. 12:1-9).[5]  Between at least approximately 2004 and 2013, the *Cachiros* engaged in extensive drug-trafficking and violence in Honduras and elsewhere, including dozens of murders and attempted murders.   These men thrived as criminals and operated with impunity based in part on longstanding relationships with Honduran politicians and businessmen, including the defendant and his co-defendant and father, Jaime Rolando Rosenthal Oliva.  (*See* Def. Submission at 5 ("Since the early 1990s, the Rosenthals had engaged in business dealings with members of a family by the name of Rivera, and after two members of the Rivera family became narcotics traffickers in the mid-2000s, proceeds of their illicit activity seeped into their commercial dealings with businesses owned by the Rosenthals.")).   In addition, beginning in at least approximately 2009, Porfirio "Pepe" Lobo Sosa ("Lobo Sosa"), who was the President of Honduras between 2010 and approximately 2013, and his son Fabio Porfirio Lobo ("Fabio Lobo"),

---

[5] After designating the *Cachiros* organization in May 2013, on or about September 19, 2013, the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated seven individuals and five businesses tied to the *Cachiros* (including Leonel Rivera and Javier Rivera) as SDNs pursuant to the Kingpin Act.   Among the businesses designated by OFAC included Ganaderos, Joya Grande, PALBASA, and Minera.   OFAC stated when it announced the sanctions, among other things, that the "*Cachiros* is a violent drug trafficking organization in Honduras whose members plow illicit drug proceeds into businesses and properties in order to gain public legitimacy and launder their wealth."   *See* https://www.treasury.gov/press-center/press-releases/Pages/jl2168.aspx.   The *Cachiros* and their various business entities remain designated by OFAC

5

joined the *Cachiros* drug-trafficking conspiracy.   (Mar. 6 Tr. 16-17, 21-24; *see also* Def. Submission at 7 ("The Honduran government actively aided the Riveras in new business ventures they established in African palm oil production and mining.")).   During that time, Lobo Sosa accepted bribes in exchange for protecting and assisting the *Cachiros*, and Fabio Lobo went even further by facilitating cocaine shipments by the *Cachiros* and helping to escort two loads of drugs for the *Cachiros* with an aggregate quantity of approximately 1.4 metric tons of cocaine.

II.      **The Defendant's Assistance to the *Cachiros* and Other Honduran Drug Traffickers**

The defendant was one of the wealthy social elite in Honduras who assisted the *Cachiros*, using his wealth, power, and privileges to facilitate a variety of business ventures that were designed as money-laundering schemes to provide the *Cachiros* with the appearance of legitimacy in Honduras and access to legitimate-seeming sources of financing.   In particular, the defendant:  (i) helped the leaders of the drug-trafficking organization launder funds through a sophisticated asset-based money-laundering scheme; (ii) aided the *Cachiros* leaders in their broader money-laundering relationship with the Honduran bank his family controlled, Banco Continental; and (iii) accepted hundreds of thousands of dollars in narcotics-derived "campaign contributions" from drug traffickers.

A.      **The Defendant Used Empacadora to Launder *Cachiros* Drug Proceeds**

The defendant's family controlled and operated a massive conglomerate of businesses maintained under a holding company named Inversiones Continental ("Grupo Continental"), which included a Honduran meat-packaging company Empacadora.   (Def. Submission at 4).   The defendant worked at Empacadora beginning in 1990, "managed" the

6

company "for periods of time," and acted as Vice President beginning in 2008.  (Def. Submission

at 4; PSR ¶ 74 ("Rosenthal Hidalgo was the general manager and director of [Empacadora]")).

Dating back to the 1990s, Empacadora purchased cattle from the family of the *Cachiros* leadership.

(Ex. A at 24:12.)  As the *Cachiros* emerged as major international drug traffickers, they began to

operate Ganaderos as a money-laundering front by using drug proceeds to purchase cattle at

auction and selling the cattle in exchange for fresh funds.

Between approximately 2008 and 2013, the *Cachiros* sold huge quantities of

narcotics-derived cattle to Empacadora as part of the money-laundering scheme.  The defendant

has admitted that:

- He "eventually became aware of the fact that the Riveras were narcotics traffickers and that proceeds of the Rivera family narcotics trafficking were used to finance and support that family's cattle-producing business."  (Ex. A 24:14-17).

- He "authorized Empacadora to buy cattle from the Riveras for Empacadora's meat packaging business, knowing that the Rivera's cattle-producing business was financed and supported by proceeds of that family's narcotics trafficking."  (Ex. A 24:19-23).

- He "authorized some of the beef that came from cattle Empacadora had purchased from the Riveras to be exported from Honduras to purchasers in the United States, and these United States purchasers sent payment for that beef via wire transfer from banks in the United States to Empacadora in Honduras."  (Ex. A 24:23-25:3).

- Through this conduct, the defendant "knowingly authorized Empacadora to engage in monetary transactions in criminally derived property of a value greater than $10,000, which property was derived from narcotics trafficking."  (Ex. A 23:12-17).

The parties agree that the actual value of the U.S.-nexus transactions involving

narcotics-derived property was approximately $500,000, which is why the defendant agreed to

forfeit that amount in the plea agreement.  (*See* PSR at 28).  Nearly all of the funds returned by the

7

U.S.-based beef purchasers to Empacadora were routed through Banco Continental. But the scope of the Empacadora-Ganaderos money-laundering relationship was much broader than the U.S.-nexus transactions. The defendant concedes that "[b]etween 2007 and May 2013"—when the *Cachiros* organization was sanctioned by OFAC—Empacadora paid approximately $6.8 million to Ganaderos. (Def. Submission at 11). Although not violations of Title 18, United States Code, Section 1956 and 1957, all of the payments leading up to that aggregate amount involved foreign money-laundering transactions.

Although the defendant now professes ignorance regarding fees associated with these dealings (*see* Def. Submission at 19-20), he cannot seriously maintain that he directed Empacadora to purchase cattle from Ganaderos at face value without any profit to the business. Indeed, emails from 2009 between Jaime Rosenthal and the defendant—using a Banco Continental email address—demonstrate that Empacadora was struggling financially. (Ex. B at 10 (defendant writing "I told For the above reasons I told my Dad that in the long run there is no future in this business [at Empacadora]. After elections I can transfer my office back to Empacadora to make a final effort and see whether operational margins can be improved.")). This financial incentive helps to explain the nature and scope of the defendant's support of the *Cachiros* through the relationship between Empacadora and Ganaderos.

**B.     The Defendant Accepted Substantial "Campaign Contributions" From Honduran Drug Traffickers During His 2012 Presidential Campaign**

Further to the financial motivations that drove the defendant's participation in the offense, he accepted at least two "campaign contributions" from major Honduran drug traffickers while he acted as a Honduran Congressman and campaigned for the Honduran presidency in

8

approximately 2012.  (*See* Def. Submission at 18).  Javier Rivera paid the defendant approximately

$150,000 in drug-derived cash in an effort to ensure that members of *Cachiros* would receive

protection and favorable law enforcement treatment and extradition policies if the defendant and/or

his associates were in a position to provide it.  (PSR ¶ 27).[6]  Around the same time, the defendant

accepted $200,000 in drug money from another major Honduran drug trafficker named Carlos

Arnoldo Lobo.[7]

       These facts appear to be undisputed, but the defendant "vehemently denies" that he

accepted these payments with "any intent or promise" of doing anything improper for these drug

traffickers.  (Def. Submission at 19).  The Government has no evidence of an explicit *quid pro*

*quo*, but respectfully submits that the circumstances of these large cash payments—particularly in

the context of the relative strength of U.S. dollars in Honduras and the poverty in the country—

---

[6] The PSR states incorrectly that this payment occurred in approximately 2009.

[7] In April 2014, OFAC designated Carlos Lobo pursuant to the Foreign Narcotics Kingpin Designation Act based on his "significant role in international narcotics trafficking" including drug trafficking that involved Joaquin "Chapo" Guzman, the former leader of the Mexican Sinaloa Cartel.  *See* OFAC, Treasury Targets Honduran Maritime Drug Trafficker Carlos Arnoldo Lobo (Apr. 9, 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl2350.aspx.  Lobo was subsequently extradited to the United States based on a drug-trafficking charge.  *See International Narcotics Trafficker Extradited from Honduras to United States Sentenced* (Dec. 9, 2014) (U.S. Attorney characterizing Carlos Lobo as "one of the most significant drug traffickers in Central America"), https://www.justice.gov/usao-sdfl/pr/international-narcotics-trafficker-extradited-honduras-united-states-sentenced (last accessed Feb. 28, 2017).  He pleaded guilty in the Southern District of Florida to a violation of Title 21, United States Code, Section 963, and was sentenced to a 240-month term of imprisonment.  *See United States* v. *Lobo*, No. 11 Cr. 20358 (S.D. Fl.).

support the inference that the defendant understood that he may be called upon to do favors for these drug traffickers after having knowingly accepted their drug money.

### C.   The Defendant Participated In Other Aspects of the *Cachiros*-Rosenthals Money-Laundering Scheme

The money-laundering relationship between the defendant, Jaime Rosenthal, and the leaders of the *Cachiros* centered around Banco Continental and was much broader than the part of the scheme involving cattle sales to Empacadora.

In 2009, Banco Continental issued a loan to Ganaderos in the amount of approximately $5.3 million.  Between June 2009 and August 2011, Empacadora made payments to Ganaderos by reducing the loan balance due from Ganaderos and/or paying monies that Ganaderos used to repay other Ganaderos or Cachiros loans outstanding at Banco Continental.

Between 2010 and 2011, Banco Continental issued credit in the amount of approximately $3.175 million to PALBASA, another money-laundering front used by the *Cachiros*.  (Def. Submission at 18).  The funds were used to finance the purchase of extraction equipment from a Malaysian firm in a transaction that involved additional financing from an Export-Import Bank in Malaysian.  In June 2010—years after the defendant admits he understood the leaders of the *Cachiros* were drug traffickers—Jaime Rosenthal issued a guarantee on behalf of Banco Continental relating to a loan in excess of $8 million from the Export-Import Bank.  (Ex. C at 5).  On or about July 23, 2010, PALBASA wired approximately $2 million to the manufacturer of the extraction equipment via Banco Continental.  In August 2010, co-defendant Andres Acosta urged Fabio Lobo—the son of then President of Honduras and now a convicted drug trafficker— as follows:

10

Fabio.

Try to officially obtain, by means of a Letter from the President, what projects need to end/be voided within the two-year government term, which is what remains of this Presidential term.

You know with whom you can find the fastest negotiating channels here in Honduras representing the Government, it is with the Malaysians, who are willing to help us.

Regards,
Andres Acosta

(Ex. D at 3).  Fabio Lobo forwarded the email to his father within minutes.  (*Id.*).

In December 2010, Jaime Rosenthal sent letters to the Export-Import Bank in Malaysia that referred to Banco Continental's "loans outstanding" to Ganaderos, which he described as being "owned by the same group" that owns PALBASA, *i.e.*, the leaders of the *Cachiros*.  (Ex. C at 1-4).  Rosenthal also explained that Ganaderos owned the land that would be used by PALBASA, and proposed that Banco Continental issue a $6 million mortgage loan to PALBASA.  (*Id.* at 3).

The defendant, Jaime Rosenthal, and co-defendant Andres Acosta Garcia also helped the *Cachiros* use financing from Banco Continental to fund a zoo in Honduras named *Inversiones Turisticas Joya Grande* ("*Joya Grande*").  (PSR ¶ 20).  Specifically, Leonel Rivera established Joya Grande in Honduras to launder the proceeds of his drug-trafficking activities and to gain access to assets and credit that would appear to be legitimate.  In connection with establishing Joya Grande, Javier Rivera introduced Leonel Rivera to Jaime Rosenthal and Acosta to discuss a potential loan.  Jaime Rosenthal advised Leonel Rivera to pursue the loan from Banco Continental in the name of associates rather than Leonel Rivera because Leonel Rivera was a drug

11

trafficker.  In April 2011, the defendant notarized a detailed document setting forth the terms of a Banco Continental loan to Joya Grande in the amount of approximately $850,000 from Banco Continental to Joya Grande.  (Ex. E).  The document executed by the defendant indicates that the loan closing was attended by a representative of Banco Continental and four straw borrowers rather than either of the leaders of the *Cachiros*.[8]

Finally, in approximately June 2013, a month after OFAC designated the *Cachiros* drug-trafficking organization, Jaime Rosenthal approved a loan of over $300,000 to PALBASA, which was secured by property in Colon Department with joint guarantees from, among others, Javier Rivera.  (Ex. F).  This post-OFAC-designation document indicates that the "formalization" of the loan, including preparation of a mortgage note and deed, would be undertaken by the defendant's law firm ("'Central Law' Law Firm").  (Ex. F at 1, 3).

*       *       *

The Government respectfully submits that the nature and scope of these additional transactions involving *Cachiros* front companies and Banco Continental provide important additional context for the nature and circumstances of the defendant's offense.  Although the defendant emphasizes that he was neither an employee nor a director of Banco Continental, the Court should still consider these transactions and his direct role in some of them under Section

---

[8] In addition to Ganaderos, PALBASA, and Joya Grander, Banco Continental advised the leaders of the *Cachiros* regarding the establishment of a mining company named Minera Mi Esperanza, S.A.  (PSR ¶ 17).  For example, Jaime Rosenthal and Acosta agreed with the *Cachiros* that Minera payments would be made via Banco Continental, and bank records show that the Cachiros did in fact use Banco Continental to wire funds:  on December 21, 2012, a $25,765 wire by *Banco Continental* to a company on Minera's behalf.

3553(a).  *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."); *see also United States* v. *Watts*, 519 U.S. 148, 152-54 (1997).

The defendant's arguments about his job title also exalt form over substance in several respects.  (Def. Submission at 14-16).  His knowledge of these additional high-value transactions with members of the *Cachiros* and the extent of the relationship between the bank and this drug-trafficking organization can be inferred from the fact that the defendant was "on the board of the holding company for Banco Continental."  (PSR ¶ 74).  The defendant maintained his law firm's office in the same building as Banco Continental's headquarters.  Empacadora maintained bank accounts at Banco Continental with extensive international wire activity, the defendant communicated with his father about business matters not limited to Empacadora, and he used an email address associated with the bank's Internet domain (continental.hn).  For example, in October 2014, the defendant and co-defendants Jaime Rosenthal and Yankel Rosenthal worked together to entice a power-generation company to establish operations on property controlled by the Rosenthal family at Puerto Cortes in Honduras.  (Ex. G).

The defendant's formal job title at Empacadora also understates his role across other affiliates of Grupo Continental.  As stated in the PSR based on the defendant's disclosures,

13

the defendant also acted as "the president of a sausage manufacturing company (Alimentos Continental S.A.) and a cement manufacturing company (Cementos del Norte S.A.)," and a director

> of a newspaper (Editorial Honduras S.A.), an insurance company (Seguros Continental S.A.), a television station (Canal 11), a construction company (Constructora Continental Delta S.A.), an import export business (Distribuidora Barrett S.A.), and a cement bag manufacturing company (Sacos del Atlantico).

(PSR ¶ 74).  The defendant also "used to hold an ownership interest in each of these companies but was forced to resign and relinquish his ownership stake by the Honduran government and OFAC designation."  (*Id.*).  Based on this evidence and the defendant's admission that he was aware that the leaders of the *Cachiros* were drug traffickers by the time he began to act as Vice President of Empacadora in 2008, the Government respectfully submits that extensive additional activity between Banco Continental and the *Cachiros* front companies serves as an additional aggravating consideration at sentencing.

## A GUIDELINES SENTENCE IS APPROPRIATE IN THIS CASE

**I.      Applicable Law**

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should

be the starting point and the initial benchmark." *Gall* v. *United States*, 55 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*See* 18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall* v. *United States*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S.

15

338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita* v. *United States*, 551 U.S. at 349.  To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Gall*, 552 U.S. at 50.

## II.        The Defendant Facilitated the Activities of Violent Drug-traffickers

The Government respectfully submits that a Guidelines sentence would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.  Such a sentence would appropriately take into account the Guidelines and Section 3553(a) factors.

### A.        The Nature and Circumstances of the Offense

The defendant's crime was serious, long-running, and devastating to his country. With respect to Empacadora alone, the defendant authorized approximately $6.8 million in payments to a *Cachiros* front company that the defendant knew was being funded by drug-trafficking proceeds.  While he was doing so, the defendant and his co-defendants were further facilitating the *Cachiros* money-laundering activities by providing them access to substantial amounts of legitimate funds through Banco Continental.  The defendant's conduct was abhorrent, not only because he chose to help violent drug-traffickers, but because he did so from a position of privilege.  And while the defendant was helping launder the *Cachiros* drug money, the *Cachiros* were devastating their country through violence and importing tons of cocaine into the United States.

16

The defendant claims that some of the transactions at issue between Banco Continental and the *Cachiros* were "legitimate, arm's length financial transactions." (Def. Submission at 16). This is wrong. The defendant has acknowledged his awareness that the leaders of the *Cachiros* were drug-traffickers by 2008. Like his father, he is a sophisticated businessman with extensive transactional experience. By permitting these transactions, both men knew that they were providing the *Cachiros* with access to Honduran credit markets and the international financial system in ways that drug traffickers cannot obtain using drug-derived cash. This type of arrangement is anything but legitimate and permits drug trafficking to flourish, regardless of the fees that the defendant and his father charged for these transactions.

The defendant's other "mitigating factors" with respect to the nature and circumstances of the offense are series of non-sequiturs that are not persuasive. (Def. Submission at 32). First, the fact that Empacadora had a business relationship with the Rivera family that allegedly predated their entry into the narcotics trade does not mitigate in the defendant's favor. When the defendant became Vice President of Empacadora in 2008, he became aware that the *Cachiros* were drug-traffickers. He nevertheless made a conscious decision to authorize Empacadora to continue doing business with the *Cachiros* for years, including while he was a sitting Congressman.

Second, the defendant's contention that he did not hide his relationship with the *Cachiros* is not credible. The defendant was a Honduras Congressman between 2010 and 2014, and has represented in his submission that he was focused on curbing drug-trafficking in his country. Certainly the defendant would not have wanted his constituents to know that while he

17

was allegedly working to stop drug-trafficking, he was knowingly laundering drug proceeds that belonged to the most powerful drug-trafficking organization in the country.

Third, it seems unlikely that none of the defendant's conduct in connection with the *Cachiros* violated Honduras law.  In fact, one of the laws touted by the defendant as part of his career as a Congressman was "a forfeiture law that made it easier for the Honduran government to seize drug trafficker assets."  (Def. Submission at 19).  Such a law would seem to implicate the *Cachiros* assets held at Empacadora and Banco Continental, as well as funds provided by the defendant and his family to the leaders of the *Cachiros*.  But even if there was no specific law covering his conduct, the defendant had an ethical and moral obligation to report the *Cachiros* to the authorities and otherwise to stop doing business with them.  Instead, he chose to accept their drug money and make a profit.

Finally, the defendant's reference to "the atmosphere of fear" in Honduras is completely self-serving and otherwise not a mitigating factor to the defendant's sentencing.  The defendant was a member of one of the most powerful families in Honduras with virtually unlimited resources.  He was not afraid of the *Cachiros*; nor did he enter into business deals for fear of falling out of their favor.  The defendant chose to conduct business with them because he was greedy.  And while the Government acknowledges that Honduras may be the "murder capital of the world," *see* Def. Submission at 32, Honduras earned that title in part because elites in the country, like the defendant, created a political and structural environment where violent drug-trafficking organizations can thrive.

### B.      The History and Characteristics of the Defendant

The defendant committed his crimes as a politically, economically, and socially powerful member of Honduras's elite.  He was born into a wealthy family, and his father was Vice President of Honduras between approximately 1986 and 1990.  The defendant earned an MBA and a law degree and was deeply involved in Honduran politics.  (PSR ¶ 69).  He served as a minister to the President of Honduras between 2006 and 2008, a Honduran congressman between 2010 and 2014, and a candidate for President of Honduras in the 2013 election.  (*See* Def. Submission at 8, 19).

Despite his privileged upbringing and social status, the defendant violated the trust placed in him as a public figure and elected official by individuals who trusted him to represent their interests.  In so doing, the defendant demonstrated his lack of respect for the law and basic ethical norms.  The defendant also did not concoct this money-laundering scheme in the face of economic difficulties—unlike many defendants who appear before the Court he was fully capable of making a comfortable, indeed a wealthy, living lawfully.

As to his disrespect for the law, the duration of the defendant's crime speaks for itself.  His crime was not a one-time event arising, for example, from a split-second decision made under financial distress.  Rather, the defendant's crime was the product of a series of decisions made over a course of years, and it was within his power to stop his crime at any point in time.  The defendant apparently disregarded—or did not care—that he was facilitating the activities of a violent drug-trafficking organization that was ravaging his country with violence and transporting tons of cocaine in the process.

19

Moreover, the defendant did not initiate his criminal scheme because of an inability to make money legally.  He had every opportunity to succeed in life through legitimate work, given his law degree, his family connections, and his business holdings.  The defendant chose to abandon honest work to help the *Cachiros* obtain legitimate funds, thereby supporting their criminal enterprise.  Although the defendant could have ended his scheme at any time, he chose not to do so.  Instead, it was only after the *Cachiros* and their businesses were designated by OFAC that it became clear to the defendant that it was no longer possible to launder their drug-trafficking proceeds.  By then, he had already been laundering drug-trafficking proceeds with the *Cachiros* for five years, which no doubt facilitated their rise as the most powerful drug-trafficking organization in Honduras.

C.      **The Need to Afford Adequate Deterrence**

A sentence within the Guidelines Range is also necessary to serve the purpose of affording adequate deterrence to criminal conduct.  The audacity of the defendant's crime has understandably captured the attention of the public in the United States and Honduras.  Thus, the deterrent message and effect of the sentence imposed by the Court in this case will resonate significantly with any powerful official tempted to engage in conduct similar to the defendant's.  This case also illustrates why arresting drug-traffickers like the *Cachiros* will not suffice to stem the tide of cocaine coming into this country.  Drug traffickers will be replaced and the *Cachiros* likely already have been.  What must be attacked and targeted is the political and structural support provided to drug traffickers in countries like Honduras that allows drug traffickers to flourish at monumental levels.  A significant sentence in this case would send a clear message to the political

and social elite in Honduras that supporting drug-traffickers will result in severe consequences in the United States.  Indeed, as Judge Schofield stated during Fabio Lobo's sentencing, the most "damning fact in [Fabio Lobo's] background" is that he used his "political network" to "facilitate[] strong government support for a large drug trafficking organization . . . and [he] enriched [himself] in the process."  (*See* Ex. H, Transcript of Fabio Lobo Sentencing, September 5, 2017).[9]  In short, it was only with the help and support of the political and social elite that the *Cachiros* were able to thrive in Honduras.

With regard to both specific and general deterrence, the Court should also consider that the defendant's conduct continued for years despite the fact that he knew the *Cachiros* were drug-traffickers.  The defendant's conduct also continued during a time when he was—according to his submission—"consistently vot[ing] in favor of laws aimed at curbing drug trafficking." (Def. Submission at 19).  If the defendant truly wanted to stop rampant drug-trafficking in his country, he would not have spent years helping the *Cachiros* launder millions of dollars of drug proceeds through his family's businesses and bank.

D.     **The Defendant's Sentencing Submission**

In his sentencing submission, the defendant requests a time-served sentence primarily because he (i) has a history of positive acts in the community; and (ii) has suffered

_____

[9] On September 5, 2017, Fabio Lobo was sentenced to twenty-four years' imprisonment for participating in a conspiracy, from in or about 2009, up to and including in or about July 2014, to import five kilograms and more of cocaine into the United States, and to manufacture and distribute five kilograms and more of cocaine, knowing and intending that it would be unlawfully imported into the United States, in violation of Title 21, United States Code, Sections 963, 952, 959, and 960(b)(1)(B).

21

"uniquely severe consequences" since being indicted.  These arguments are not persuasive.[10]

First, some of the defendant's past conduct in the community is admirable and militates in his favor at sentencing.  But the defendant's conduct in this case suggests that money talks and that given the opportunity to profit, the defendant will do so regardless of the source of the funds or the consequences to his country.  That the defendant chose to commit the offense of conviction notwithstanding that he was a wealthy and powerful politician only underscores his culpability and militates in favor of a Guidelines sentence.

Moreover, the defendant has not suffered "uniquely severe consequences" in this case.  It is true that, as a result of the defendant's crime, he has been separated from his family and has lost some of his vast wealth in Honduras.  But those foreseeable consequences are not a mitigating feature of this sentencing.  Moreover, the financial losses suffered by the defendant's family were caused principally by the October 2015 OFAC designations and actions of the Honduran Government, as opposed to steps taken by the prosecution here or punitive actions related to the defendant's violation of U.S. criminal law.  The defendant was a powerful, mature, and experienced businessman, politician, and attorney, who was more than capable of supporting his loved ones through a legitimate livelihood.  Instead, he made the choices that resulted in him being separated from his family and losing some of his wealth.

\* \* \*

---

[10] The Government addresses the defendant's acceptance of responsibility in a separate sealed submission.

22

In sum, the defendant's criminal conduct was not "circumscribed."   (Def. Submission at 37).  He *authorized* a years-long money laundering operation involving the most violent drug-trafficking organization in Honduras.  The defendant has not been unfairly punished for his conduct.  He was a Honduras Congressman with vast political, social, and economic power who acted with impunity to enrich himself and to support the *Cachiros* all to the detriment of his fellow citizens and the conditions in Honduras and the United States.  Based on his offense and his characteristics, a Guidelines sentence is necessary to provide just punishment, to promote respect for the law, and to afford adequate deterrence—particularly general deterrence with respect to powerful and politically connected individuals like the defendant who seek to use their power to facilitate the activities of drug-trafficking organizations in their countries.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that a Guidelines sentence is appropriate in this case.

Dated: New York, New York
       December 8, 2017

                                    Respectfully Submitted,

                                    JOON H. KIM
                                    Acting United States Attorney
                                    Southern District of New York


                            By:   ___/s/_____
                                    Emil J. Bove III
                                    Matthew J. Laroche
                                    Assistant United States Attorneys
                                    Tel.: (212) 637-2444

23